IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AMIR OKANOVIC and ASMINA OKANOVIC,** : | CIVIL ACTION NO. 1:18-CV-957 |
| : | |
| **Plaintiffs** : | **(Chief Judge Conner)** |
| : | |
| v. : | |
| : | |
| **ROBERT HAYES and USA TRUCK INC.,** : | |
| : | |
| **Defendants** : | |

## MEMORANDUM

Plaintiff Amir Okanovic ("Okanovic") and his wife filed the instant lawsuit following a tractor-trailer accident in the parking lot of a truck stop. Trial is set to begin in approximately one week. Defendants Robert Hayes ("Hayes") and USA Truck, Inc. ("USA Truck") (collectively, "defendants") have filed four motions *in limine*, (Docs. 19-22), seeking to exclude certain evidence at trial. We will grant in part and deny in part defendants' motions.

## I. Factual Background & Procedural History[1]

The relevant facts in this case are largely undisputed. The tractor-trailer accident occurred at a truck stop in central Pennsylvania on May 25, 2016. (Doc. 1 ¶ 1). At that time, Okanovic, who resides in New York, was a self-employed tractor-trailer operator. (Id. ¶ 8). Around 9:00 p.m., Okanovic was asleep in the "sleeper berth" of his parked tractor trailer. (Id. ¶¶ 9-10). Hayes, who was working as a

---

[1] The following factual background is derived primarily from the parties' pleadings, as neither party has moved for summary judgment.

driver for USA Truck, hit the rear portion of Okanovic's parked vehicle. (Id. ¶ 12). Okanovic alleges that the collision caused him to fall from the top bunk of his sleeper berth onto the floor of his tractor trailer, resulting in substantial, permanent injuries to his lower back. (Id. ¶¶ 1, 13, 16, 24).

Okanovic filed suit in May 2018, alleging negligence against Hayes and USA Truck. The parties agree that the accident occurred and that Hayes was negligent for hitting Okanovic's tractor trailer. Defendants challenge causation—both cause-in-fact and proximate cause—as well as the nature and extent of Okanovic's damages. Trial is scheduled to begin on November 12, 2019. Defendants filed four motions *in limine*, which seek to exclude evidence that they believe is irrelevant or unfairly prejudicial or does not meet the requirements of Federal Rule of Evidence 702. The motions are fully briefed and ripe for disposition.

## II. Discussion

Defendants' admissibility challenges implicate two general categories: (1) information regarding Okanovic's immigration history and his pursuit of "the American dream," and (2) the expert qualifications of Robert Nobilini, Ph.D. ("Dr. Nobilini"). We will address these issues *seriatim*.

### A. Okanovic's Personal Background[2]

Okanovic's personal history is equal parts tragedy and triumph. He was born in Bosnia and fought on the front lines (for the losing side) in that country's civil war. He and his family were eventually forced out of Bosnia and became refugees,

---

[2] The following biographical information derives from the parties' briefing and Okanovic's deposition testimony.

2

living in refugee centers in Croatia for two years until they immigrated to the United States in 1997. According to the parties, Okanovic and his family were also subjected to post-war internment, suffering through illness and "unspeakable" living conditions, before resettling in the United States. (See Doc. 19 at 2).

Following the family's relocation to this country, Okanovic rebuilt his life "from scratch." (Doc. 29 at 7). He learned English and worked as a machine operator making medical supplies. He attended trucking school in the morning while continuing to work full-time as a second-shift machinist, eventually earning his Commercial Driver's License ("CDL"). Okanovic worked briefly for several large trucking companies before starting his own trucking business in 2005. From that time until the accident, he was self-employed as an owner-operator.

### 1. *Pre-Immigration Life and Immigration Status*

Defendants seek to preclude any reference to Okanovic's pre-immigration life and hardships, as well as to his immigration status. They argue that such information is both irrelevant and overly prejudicial.

Evidence is relevant when it tends to "make a fact more or less probable than it would be without the evidence" and that fact is consequential to the outcome of the case. FED. R. EVID. 401. Rule 401's definition of relevant evidence is "very broad" and "does not raise a high standard." Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 544 (3d Cir. 2007) (citation omitted). Even if evidence is relevant, it may still be inadmissible if it is unduly prejudicial in comparison to its probative value. Rule 403 provides that relevant evidence may be excluded "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403 (emphasis added).

We agree with defendants that Okanovic's pre-immigration hardships, while tragic, have little bearing on the issues remaining for trial in this motor vehicle accident case. Okanovic and his family members' difficult experiences in internment camps and refugee settlements do not make any fact regarding causation more or less probable, and their relation to damages is tenuous. We find that any probative value of this information is substantially outweighed by the danger of unfair prejudice to defendants by way of juror sympathy.

Okanovic's immigration status is different. Okanovic intends to testify at trial, and his testimony and credibility will be a critical part of this case. Providing a brief background regarding his relocation from Eastern Europe to the United States would help to explain his accent and lay a foundation regarding the history of his trucking business. Such a background is relevant to Okanovic's damages, in particular the alleged loss of his CDL and trucking enterprise due to the accident, and would implicate little, if any, prejudice to defendants. Accordingly, we will exclude any discussion of Okanovic's pre-immigration hardships but will permit foundational testimony regarding his immigration status and his educational, employment, and business history.

### 2. *Testimony Regarding "the American Dream"*

Defendants contend that any reference to the purported loss of "the American Dream" should be excluded from trial. During their depositions, Okanovic and his daughter both mentioned losing "the American Dream" in

4

relation to alleged damages from the accident. (See Doc. 20 at 2 nn.2-3). Defendants posit that this expression has no probative value, will confuse the jury, and is highly prejudicial. We disagree.

The phrase, "the American Dream," has a generally accepted cultural understanding. It represents the egalitarian ideal that any person—no matter his or her circumstances—can achieve success and, often, material prosperity, especially by hard work. See *American Dream*, Webster's Third New International Dictionary, Unabridged (2019); *American Dream*, Oxford English Dictionary (2019). Contrary to defendants' assertions, the phrase is probative and relevant under the minimal requirements of Rule 401, particularly in relation to Okanovic's claimed damages. We reject defendants' position that Okanovic's losses with respect to his business are cabined to sterile figures regarding past earnings and future projections. Compensatory damages include, *inter alia*, "mental anguish" and "loss of life's pleasures," (see, e.g., Doc. 47 at 39 (defendants' proposed jury instructions)), nonpecuniary losses that lack rigid parameters but which juries are regularly asked to value. Losing one's self-made business has worth beyond mere past and future earnings, and juries are quite capable of estimating such nonpecuniary losses.

In sum, we will not preclude a personal injury plaintiff from testifying about his alleged damages in a manner that is meaningful to him and easily understood by the jury when there is, correspondingly, a slim possibility of prejudice to the defendants. Rule 403 requires more. Defendants will have ample opportunity to rebut Okanovic's damages claims, but we decline to preemptively curtail Okanovic's chosen language in presenting his case.

5

### B. Dr. Nobilini

Defendants also take issue with plaintiffs' proffered expert, Dr. Nobilini, who holds a B.S., M.S., and Ph.D. in mechanical engineering with a concentration in biomechanics. Defendants posit that while Dr. Nobilini may be an expert in biomechanical engineering, he lacks the requisite expertise to render opinions concerning the fields of both "human factors" and medicine. According to defendants, portions of Dr. Nobilini's proposed testimony must be precluded because he is not, as an initial matter, "qualified as an expert by knowledge, skill, experience, training, or education" in these two fields. See FED. R. EVID. 702.

#### 1. *"Human Factors" Challenge*

Defendants assert that portions of Dr. Nobilini's report and conclusions implicate "expert analysis that is solely within the discipline of a human factors expert," and because Dr. Nobilini's expertise is in biomechanics he cannot testify on such matters. (Doc. 21 at 4). Defendants appear to focus on the portions of the report that discuss Okanovic's alleged response to being startled by the collision while asleep in his truck's sleeper berth. (See id. at 2-3).

We begin by briefly describing each expert field. Human factors (or ergonomics) "is the scientific discipline concerned with the understanding of interactions among humans and other elements of a system, and the profession that applies theory, principles, data, and other methods to design in order to optimize human well-being and overall system performance." *What is Human Factors/Ergonomics?* HFES.ORG, http://hfes.org/about-hfes/what-is-human-factorsergonomics (last visited Nov. 1, 2019); see also Hamilton v. Emerson Elec.

Co., 133 F. Supp. 2d 360, 368 (M.D. Pa. 2001).  Biomechanical engineering applies "the principles of mechanics to the facts of a specific accident and provide[s] information about the forces generated in that accident," and may "explain how the body moves in response to those forces, and . . . determine what types of injuries would result from the forces generated."  Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007) (second alteration in original) (citations omitted).  Stanford University describes the field as combining mechanical engineering with "a working understanding of biological and/or medical systems and processes."  *Biomechanical Engineering Program*, ME.STANDFORD.EDU, https://me.stanford.edu/groups/biomechanical-engineering-program (last visited Nov. 1, 2019).

     Defendants' argument is long on inapposite case law but short on explaining why Dr. Nobilini's extensive study, training, and scholarship in biomechanics, (see Doc. 31 at 31-34), precludes him from proffering testimony reflected in his report, which falls squarely within his field of expertise.  We decline to preclude Dr. Nobilini's expert testimony simply because it incorporates Okanovic being "startled" from sleep, a phenomenon that is easily understandable to a lay juror and in fact does not require an expert explanation.  Moreover, Dr. Nobilini's specialized training in biomechanics is more than adequate to provide him with knowledge regarding how Okanovic could have moved in his bunk if "startled," including whether being startled could cause abdominal muscle contraction and hip flexion (*i.e.*, Okanovic drawing his knees upward).  (See Doc. 31 at 23).  Accordingly, we find no merit in defendants' "human factors" argument.

## 2. *Medical Expertise Challenge*

Defendants next contend that Dr. Nobilini's report strays from biomechanics into a field reserved for medical experts. They posit that "[w]ithout medical training and expertise, Dr. Nobilini is unqualified to opine whether the injuries claimed by Okanovic are consistent with his fall." (Doc. 38 at 2). "[T]he most he is qualified to provide," they maintain, "is information as to the mechanism of injury and the level of loading[.]" (Id.) Defendants are only partially correct.

Similar challenges regarding the extent of expertise of biomechanical engineers have been raised in this district and other circuits. See, e.g., Kern v. Purina Animal Nutrition, LLC, No. 1:16-CV-1572, 2018 WL 8193884, *1-2 (M.D. Pa. May 14, 2018); Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 332-34 (M.D. Pa. 2009); Bowers, 537 F. Supp. 2d at 1376-77. Because biomechanical engineers have specialized training that involves both mechanical engineering and how mechanics relate to biological and medical systems, "biomechanical engineers typically are found to be qualified to render an opinion as to the forces generated in a particular accident *and the general types of injuries those forces may generate*." Bowers, 537 F. Supp. 2d at 1377 (emphasis added); Kern, 2018 WL 8193884, at *1. In other words, biomechanical engineers may testify as to whether "the force sustained . . . in the subject accident could potentially cause certain injuries[,] as this amounts to a biomechanical determination." Burke, 617 F. Supp. 2d at 334.

Dr. Nobilini's challenged conclusion straddles the type of general causation opinion that is permissible and specific causation opinion reserved for medical professionals. He opines that the "mechanism of injury" and "level of loads" are

"consistent with" causing or exacerbating Okanovic's diagnosed lumbar injuries. (Doc. 31 at 28). We agree with defendants that, to the extent that Dr. Nobilini testifies about causation, he is not permitted to discuss specific causation. Rather, he may only testify as to whether the "mechanism of injury" and "level of loads" in the instant case *could* cause the type of injuries at issue, not whether they *did cause Okanovic's injuries*. See Kern, 2018 WL 8193884, at *2; Bowers, 537 F. Supp. 2d at 1377; Burke, 617 F. Supp. 2d at 334. The latter opinion is reserved for a qualified medical expert.[3]

## III. Conclusion

The court will grant in part and deny in part defendants' motions (Docs. 19-22) *in limine* as more specifically stated above. An appropriate order shall issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: November 4, 2019

---

[3] Plaintiffs identify "Dr. Harvey Smith" as just such a medical expert who will testify at trial as to specific causation. (See Doc. 32 at 7).